On Application for Rehearing
EN BANC
HOOD, Judge.
We granted a rehearing in this case to reconsider our earlier finding that Mr. Reeves is able to care for his person and to administer his own estate.
*554 Sixteen lay witnesses, including six practicing attorneys, testified as to facts or expressed opinions relating to the issue of whether the defendant is mentally competent to manage his own business affairs. Two of the attorneys who testified felt that the defendant was incompetent to administer his estate, while four felt that he could do so. We think we correctly analyzed the testimony of each of the lawyers in our original opinion. The statements and opinions of some of the other lay witnesses also are conflicting as to Mr. Reeves’ mental competency, and on considering this case originally we concluded, contrary to the findings of the trial judge, that the lay evidence is not sufficient to support a judgment of interdiction.
In reconsidering all of the evidence, we are impressed by the fact that the lay witnesses who recently have lived in the same residence building with Mr. Reeves, and who thus have had the best opportunity to observe him for extended periods of time, are of the opinion that he is mentally incapable of managing his business affairs. These witnesses included: Mrs. Newton Paul, in whose home Mr. Reeves lived for about four years, from 1959 until 1963; Mrs. T. J. O’Neal, who was his landlady for about seventeen months, from the middle of 1963 until the latter part of 1964, when this suit was filed; and Leroy Tcddlie, who was a boarder in the O’Neal home while the defendant was living there.
The lay witnesses, other than practicing attorneys, who expressed opinions to the effect that the defendant was mentally competent to manage his affairs, consisted of people who had known the defendant for long periods of time, but who had had little contact with him in recent years, the only exceptions being Mr. and Mrs. J. W. Bradford, in whose home the defendant lived for about two months, in 1963. We note, however, that Mrs. Bradford, who is a first cousin of the defendant and was called to testify in his behalf, although expressing the opinion that Mr. Reeves is capable of taking care of his affairs, went on to explain that “naturally he’s old and he needs help,” and that he can realize the nature of a transaction “when they don’t keep him off and flatter him up and promise him a whole lot of stuff.” She further stated:
“A. He may be mislead and make some mistake, if he’s be left alone. You know people can be flattered a whole lot of times.”
******
“Q. Do you feel that in his present condition be may be susceptible of being mislead?
A. I don’t know, but there is a possibility he could be.”
Mr. Frank Jenkins, another witness who was called by the defendant, testified that he obtained a lease from Mr. Reeves in March, 1962, and that the latter seemed to realize the nature of the transaction at that time. He states, however, that there has been such a change in the mental condition of the defendant since 1962 that he would not deal with him on another lease now. Fie further testified:
“Q. Do you believe he would understand a lease today, fully? It’s full ramifications and what it meant?
A. Well, I’m gonna answer you like that — the way things has went and the deals that’s been pulled, I don’t believe he would.”
* * * * * *
“A. That’s right, because I say this, you will talk him out of the notion one day and another one will get him tomorrow and he’ll talk him out of the notion and you’ll go that way, well, what good would a lease do me.”
******
“A. Well, I think he’s too easy persuaded over to change to the other side. I don’t think he’s strong enough that he was several years ago but what he can *555 be — he’s weak and he can be persuaded over, you sign this paper for me today I’ll do away with his papers tomorrow, that’s the way it’s proved up.”
After reconsidering all of the evidence, we have decided that we erred in our original finding that the lay testimony is not sufficient to support a judgment of interdiction. We are now convinced that it does support such a judgment.
In our opinion, the lay evidence shows that Mr. .Reeves has a bad memory loss which makes it impossible for him to remember events which transpire from day to day; that he frequently gets lost in the home where he lives and is unable to find his bedroom; that he often becomes disoriented while in town and must depend on others to assist him in getting back to his home; that he sometimes goes to town with substantial sums of money and returns a few hours later broke and without any knowledge or recollection as to what happened to that money; that it is necessary for him to depend upon others to bathe and to shave him; that he is unable to keep up with his clothes, his personal belongings or the medicines which he must take regularly; that because of a kidney trouble he often soils his clothes but he experiences no embarrassment about his soiled condition while in the presence of others; and that he is easily influenced by others to enter into business transactions or to attempt to set aside those which he has entered into.
In our original opinion, we stated that the medical expert testimony preponderates that Mr. Reeves is mentally capable of managing his affairs. We quoted a portion of the testimony of Dr. Davidson H. Texada, Jr., one of the psychiatrists who examined this 82-year old man, and we concluded from the quoted statements that this doctor felt that Mr. Reeves could handle simple business matters, but that he is incapable of handling “any transaction which is legally or financially involved.” We are now convinced that we misinterpreted the portion of the testimony which we quoted, and that Dr. Texada’s testimony as a whole shows clearly that he was of the firm opinion that the subject was totally incompetent to handle his business or financial affairs. We think Dr. Texada’s opinion is concisely summed up in the following portion of his testimony:
“Well, I was asked to see Mr. Reeves primarily in relation to his competency to manage his own financial affairs. My examination of Mr. Reeves, I was of the opinion that he was not competent to do this.” (emphasis added)
Dr. Gillis R. Morin, also a psychiatrist, examined Mr. Reeves on January 25, 1965, and he talked to him again briefly on the date of the trial. On both of those occasions he found the subject to be oriented and his thought processes to be coherent, and he felt that at those times he was mentally competent to manage his affairs. He stated, however, that the subject “had a chronic brain syndrome associated with cerebral arteriosclerosis,” and that his “memory loss” was such that it would be necessary for him to be “made aware of what the situation is” before he could make a sound judgment. We interpret his testimony to be that Mr. Reeves cannot remember what he owns, what transactions he may have entered into or what the existing circumstances are, and thus he ordinarily would be incapable of making a competent business decision, but that he can make such a decision if someone informs him of all of these matters and the surrounding circumstances at the time such a decision is to be made. We think the trial judge correctly summed up Dr. Morin’s testimony, while the doctor was on the witness stand, as follows:
“ * * * I believe that the Doctor has made it abundantly clear as he can and that is simply there is a bad memory loss condition and that in business transactions in order to — for Mr. Reeves to act competently, he would have to be at the time fully informed of his — of the circumstances surrounding the business. *556 Otherwise, I take it he could not act competently.”
Our appreciation of this doctor’s testimony is that Dr. Morin feels that the defendant, acting alone, is mentally incapable of managing his own affairs, since he cannot make a competent business decision unless someone assists him by informing him of all of the facts and circumstances at the time such a decision is to be made.
Dr. Walter Murrell, coroner of Rapides Parish, examined defendant on one occasion, and Dr. Luke Marcello, coroner of Beauregard Parish, examined him twice, the examinations made by Dr. Marcello being limited strictly to his physical condition. These doctors stated that on the occasions they saw him he was oriented, and they felt that he was competent to handle his financial affairs. Dr. Murrell conceded, however, that at the times when Mr. Reeves becomes disoriented (and we think the evidence shows that this occurs frequently) he would be incompetent to manage his estate. Dr. Marcello stated that if the defendant is disoriented regularly, and we think the evidence shows that he is, he would feel that there was “some disturbance” or “some confusion in his mind,” and that while disoriented he could make an error if he was pushed or hastened into a business decision.
Dr. Edward A. Norton, the general practitioner who testified, was Mr. Reeves’ personal physician for ten years, from 1954 until September, 1964. He saw and treated the subject professionally on an average of about once or twice per month during that ten-year period, and he examined him again on the day of the trial, in June, 1965. As we pointed out in our original opinion, Dr. Norton was of the unqualified opinion that defendant was mentally incompetent to administer his business affairs. He testified, “I would say without any hesitation that he was incapable of taking care of his affairs.”
Of the five medical experts who testified, therefore, it is apparent that the two examining psychiatrists and Mr. Reeves’ personal physician feel that he is mentally incapable of managing his estate or business affairs. The other two examining physicians concede that if the defendant is disoriented as often as was stated by some of the lay witnesses, they also would conclude that there is some incompetency.
We think considerable weight should be given to the testimony of the two specialists in psychiatry and to that of Dr. Norton, who has been defendant’s personal physician for many years and has had more opportunity than any of the other examining physicians have had to observe his condition. We believe it is significant that these experts feel that he is mentally incompetent to handle his affairs.
After reconsidering the evidence, we are now convinced that we erred in our original analysis of the testimony of these doctors. We conclude that the expert medical testimony preponderates to the effect that Mr. Reeves is mentally incompetent to administer his estate or to manage his business affairs.
Finally, we have re-examined the testimony of the defendant, Mr. Reeves. Although we concluded originally that he knew what he was doing when he conveyed all of the rest of his property to his nephew, a further review of his testimony convinces us that he is not fully aware of this or of the purpose of the instant suit. We think this is illustrated by the following portions of his testimony:
“Q. Do you know what this suit is about today?
A. I have an idea—
Q. What’s it about Mr. Reeves?
A. Well it looks like he’s trying to hold it when he ain’t got nothing to hold it on, to me.
Q. Do you know what the charges are against you?
A. No, sir, I don’t figure there should be any charges against me. He told me *557 he would take this and put it back in my name for half, and he didn’t take nothing, Teekell hadn’t. I don’t figure a man deserves any pay coming to him when he don’t do nothing.”
* j{c # * * *
“Q. ■ Do you know what this suit is about today?
A. I’m not a lawyer so I couldn’t tell you exactly. Now you are the lawyer, you tell me what it’s about now — I’m going to ask you a question.”
******
fQ. You understand that this suit is an interdiction suit against you to declare you incompetent — can you understand that?
A. Yes, sir. Those parties don’t want my nephew to have nothing and they have done nothing for me and he’s stuck to me all the way through — give me a place to stay, feed me, money, do anything he can do for me, and it’s — it looks like there’s a dozen of them wanting what I’ve got — trying to get it for nothing. There’s men and women involved in this now. If a man gets to — I don’t care who it is, working to try to beat some old broke down person out of what they come by honest, there ain’t much to them —very little to a man that will try to rob an old broke down man — I don’t care who he is or where he come from. And I’m just the old boy that will tell him how sorry he is. Underminded.”
* ***** *
“Q. Mr. Reeves did you hope to get your property back some other way?
A. Me?
Q. Yes, sir.
A. Why I intend to get it somehow.”
We reiterate the observation which we made in our earlier opinion that the interdiction of a person is a grave and serious responsibility, and a judgment of interdiction should not be rendered unless the evidence clearly establishes that the defendant is mentally incompetent to care for his person or manage his estate.
After reconsidering all of the evidence in this case, however, we are now convinced that the evidence supports the judgment of interdiction which was rendered by the trial court, and that it clearly establishes that Mr. Reeves is mentally incompetent to care for his person or to manage his estate. We conclude that the judgment appealed from should be affirmed.
For these reasons, our original judgment is set aside, and the judgment of the district court decreeing the interdiction of the defendant is hereby affirmed. The costs of this appeal are assessed to the estate of the def endant-appellant.
Affirmed.